## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MINOR JGE et al.,

      Plaintiffs,

v.                                             CV 14-710 MV/WPL

UNITED STATES OF AMERICA et al.,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on the Individual Defendants' Motion to Dismiss Based on Qualified Immunity and Memorandum in Support [Doc. 43], Defendant United States' Motion to Dismiss for Failure to State a Claim and Memorandum in Support [Doc. 44], and United States' Rule 12(c) Motion for Judgment on the Pleadings Based on Lack of Subject Matter Jurisdiction and Memorandum in Support [Doc. 59]. The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the Individual Defendants' Motion to Dismiss Based on Qualified Immunity and Memorandum in Support is well-taken and will be **GRANTED**, and that the United States' Rule 12(c) Motion for Judgment on the Pleadings Based on Lack of Subject Matter Jurisdiction and Memorandum in Support is well-taken and will be **GRANTED** and, consequently, the United States' Motion to Dismiss for Failure to State a Claim and Memorandum in Support is **MOOT**.

## BACKGROUND

The tragic facts as alleged by Plaintiffs in their First Amended Complaint [Doc. 19] are as follows. On September 19, 2011, the Bernalillo County Sheriff's Department arrested Edward Quintana after a search warrant executed at his home revealed "approximately 255

grams of heroin (approximately 9 ounces of heroin), scales, approximately $12,000.00 in US Currency, and three (3) loaded stolen semi-automatic Handguns."   Doc. 19 ¶¶ 45–49.   Within six days of his release from the Metropolitan Detention Center on September 20, 2011, on September 27, 2011, Quintana had been debriefed as a Confidential Source by Defendant Christopher Scott Godier of the Drug Enforcement Administration ("DEA").   *Id.* ¶¶ 50–51, 55. *See also* Defendant's Material Jurisdictional Facts ("DMJF") ¶ 1.   Even so, "Quintana was not an employee of the United States and was not a federal law enforcement officer."   *Id.* ¶ 19.

Defendants Christopher Scott Godier, Patricia G. Whelan, and John R. Castleberry were "involved in the Recruitment, Debriefings, Establishment, Activation, Direction, Control, Management, and Supervision of" Quintana.   Doc. 19 ¶¶ 57–59.   Defendant Matthew B. Mayfield supervised and managed Defendants Godier, Whelan, and Castleberry.   *Id.* ¶ 60. Defendant Raymond "Keith" Brown supervised and managed Defendants Mayfield, Godier, Whelan, and Castleberry.   *Id.* ¶ 66.   Defendant Joseph M. Arabit supervised and managed Defendants Brown, Mayfield, Godier, Whelan, and Castleberry.   *Id.* ¶ 69.

At roughly the same time of Quintana's debriefing on September 27, 2011, the United States and the Individual Defendants in this case "created, organized, implemented, supervised, and participated in Operation Smack City—an Organized Crime Drug Enforcement Task Force (OCDETF) and High Intensity Drug Trafficking Area (HIDTA) investigation in Las Vegas, New Mexico."   Doc. 19 ¶ 53.   This investigation evidently drew heavily on the use of Confidential Informants, including Quintana, who "was registered as an active DEA Informant from on or about October 11, 2011 through April 4, 2013."   *Id.* ¶¶ 54, 75–76, 91, 102, 391.   Quintana "remained under the original State of New Mexico charges of Trafficking a Controlled Substance (heroin) and Conspiracy" while "*the United States and the Defendants controlled the*

*evidence and the status and direction of the State of New Mexico charges*" as part of the arrangement by which he worked for the United States as an informant.   *Id.* ¶¶ 82–83 (emphasis original).   At the time he was engaged by the United States to act as an informant, Quintana's "violent propensities" were clear from his criminal record, which included domestic violence, battery upon a household member, child abuse, false imprisonment, battery upon a household member with a firearm, attempted murder, kidnapping, conspiracy, felon in possession of a firearm, trafficking a controlled substance, receiving or transferring a stolen firearm, and threats of battery and arson.   *Id.* ¶ 146, 147.   In particular, in 2005, Quintana was convicted of Aggravated Battery Against a Household Member with a Deadly Weapon after battering his wife in front of his wife's children, arming himself with a handgun and pressing it against his wife's mouth, saying "I want to kill you, you fucking bitch."   *Id.* ¶ 155–164.

Sometime in August 2012, during the period in which Quintana was acting as an informant, "Quintana and his family moved into the residence of" Jason Estrada and his family. *Id.* ¶ 122.   *See also* DMJF ¶ 10 (("Quintana, with the permission of Plaintiffs, moved into Plaintiffs' residence in August 2012.").   Defendants "were aware (or should have been aware/required to be aware) of the residential location" of Quintana while he was living with the Estrada family.   Doc. 19 ¶ 364.   The Estrada family was not "aware of the DEA confidential informant status of DEA Informant Quintana."   *Id.* ¶ 125.   None of the Defendants warned Jason Estrada or his family "regarding the violent nature of DEA Informant Quintana."   *Id.* ¶ 341.

"[R]elatively *immediately*" after Quintana and his family began living with the Estrada family as "Household Members," on September 1, 2012, Quintana began to sexually abuse Jason Estrada's minor son, JGE, who was then five years old.   *Id.* ¶¶ 127, 333 (emphasis in original).

This abuse continued until February 20, 2013, when Quintana and his family moved out. *See id*. ¶ 135.

Several weeks later, "JGE worked up enough courage to inform [his parents] that [Quintana] had committed the horrifying acts of Child Molestation against JGE." *Id.* ¶ 227. Upon learning of these allegations, Jason Estrada "searched for answers and information from mutual friends and associates of [Quintana] before confronting [Quintana] about the terrible Sexual Acts he committed upon his only child." *Id.* ¶ 230. Evidently, however, Quintana learned that Jason Estrada had begun to make inquiries about Quintana's conduct. *See id.* ¶ 231. In response, on April 3, 2013, "Quintana and two other males travelled to the" Estrada residence, where, in the presence of JGE, they beat and shot Jason Estrada; Jason Estrada soon died as a result of these injuries. *Id.* ¶ 136–37, 139, 258–262. Approximately one day later, "the United States and the Defendants deactivated DEA Informant Edward Quintana." *Id.* ¶ 141.

Based on this tragic series of events, Plaintiffs claim that Defendants (1) formed a "special relationship" with Quintana and (2) created the danger of substantial risk of harms to the Plaintiffs, and thereby assumed a duty to protect and warn Plaintiffs against the "known and foreseeable dangers of harm" posed by Quintana, which duty they breached, thereby causing the harms suffered by Plaintiffs. As a result of the government's alleged breach of its duties, on February 5, 2014, Plaintiffs timely filed an administrative tort claim with the United States Department of Justice and the DEA. *Id.* ¶ 27. It appears that the agencies did not respond to these administrative claims, such that after six months Plaintiffs were permitted to file a civil action. *Id.* ¶¶ 29–31. *See also* 28 U.S.C. §§ 2401(b), 2675(a).

Thereafter, on August 12, 2014, Plaintiffs JGE, the estate of Jason Estrada, Gabriela Gallegos (Jason Estrada's wife), Jolene Gallegos (Jason Estrada's sister), and Joyce Estrada (Jason Estrada's mother) commenced the instant action.   In their First Amended Complaint, Plaintiffs set forth claims against Defendant United States, under the Federal Tort Claims Act, for negligence (Counts I through XVII), and claims against each of the individual Defendants (Godier, Whelan, Castleberry, Mayfield, Brown, and Arabit) (the "Individual Defendants"), under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), for violation of JGE and Jason Estrada's Fifth Amendment substantive due process rights to be free from bodily harm, and for violation of the First Amendment and Fifth Amendment rights of JGE, Gabriela Gallegos, Jolene Estrada, and Joyce Estrada to a continuing relationship with Jason Estrada (Counts XVIII through XXXVI).   The Individual Defendants and the government have now moved to dismiss all of the claims against them.   Plaintiffs oppose the motions.

## DISCUSSION

### I.      Individual Defendants' Motion to Dismiss

Plaintiffs allege that by activating Quintana as a confidential informant and failing to supervise him properly, the Individual Defendants created the danger, namely, Quintana, thereby causing the harms suffered by Plaintiffs.   Based on these allegations, Plaintiffs claim that the Individual Defendants engaged in conduct that violated the substantive due process rights of JGE and Jason Estrada, and deprived Plaintiffs JGE, Gabriela Gallegos, Joyce Estrada, and Jolene Estrada of their protected liberty interests in familial companionship.   The Individual Defendants move to dismiss on two separate grounds.   First, they argue that there is no recognized *Bivens* action for Plaintiffs' claims.   Second, they argue that even if the Court were to recognize a *Bivens* action, dismissal of Plaintiffs' claims is required on the basis of qualified

immunity.   As set forth herein, the Court agrees that Plaintiffs' claims against the Individual Defendants must be dismissed on the basis of qualified immunity.   Accordingly, the Court need not reach the issue of whether Plaintiffs' claims are properly brought pursuant to *Bivens*.

### A.   Legal Standard

Under Rule 12(b)(6), a Court may dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint."   *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).   When considering a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.   *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1142 (2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"   *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

The Court in *Iqbal* identified "two working principles" in the context of a motion to dismiss.   *Id.*   First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice."   *Id.*   Accordingly, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79.   "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."   *Id.* at 679; *see Twombly*, 550 U.S. at 570 (holding that a plaintiff must "nudge" her claims "across the line from conceivable to plausible").   Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief."   *Id.* (citation omitted).

> In keeping with these two principles, the Court explained,
>
> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.   When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Id.* at 679.

In the instant case, the Individual Defendants move to dismiss on the basis of qualified immunity.   Qualified immunity protects government officials performing discretionary functions "when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).   The Court employs a two-part test to analyze a qualified immunity defense.   *Id.*   Once a defendant raises the defense of qualified immunity in a Rule 12(b)(6) motion, the burden shifts to the plaintiff to (1) come forward with allegations sufficient to show that the defendant's alleged actions violated a federal constitutional or statutory right and (2) show that the federal right was clearly established at the time of the challenged conduct.   *See Pueblo*,

847 F.2d at 646; *P.J. ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196 (10th Cir. 2010).[1]  The Court

has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should

be addressed first in light of the circumstances in the particular case at hand.'"   *Lundstrom v.*

*Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223

(2009)).

### B.   The Individual Defendants Are Entitled To Qualified Immunity for Plaintiffs' Substantive Due Process Claims.

In Counts XVIII, XXI, XXIV, XXVII, XXX, and XXXXIV, Plaintiffs allege that the

Individual Defendants violated JGE's Fifth Amendment liberty interests in bodily integrity by

"creat[ing] the danger of DEA Informant Quintana," and thereby causing the emotional and

physical harms that JGE suffered as a result of the sexual assaults, child abuse, and kidnapping

committed by Quintana.  *See, e.g,.* Doc. 19 ¶¶ 961, 966.   Similarly, in Counts XIX, XXII,

XXV, XXVIII, XXXI, and XXXV, Plaintiffs allege that the Individual Defendants violated

Jason Estrada's Fifth Amendment liberty interests in bodily integrity by "creat[ing] the danger of

DEA Informant Quintana," and thereby causing the emotional and physical harms that Jason

Estrada suffered as a result of the assault, battery, and homicide committed by Quintana.  *See,*

*e.g., id.* ¶¶ 975, 980.   The essence of each of these claims is that the Individual Defendants

engaged in outrageous government conduct by creating a danger to JGE and Jason Estrada,

namely, Quintana, in violation of their substantive due process rights.   Because the Court finds

that the Complaint fails to state violations of Fifth Amendment rights and fails to show that such

rights were clearly established, the Individual Defendants are entitled to qualified immunity with

respect to the above-enumerated Counts.

---

[1] The qualified immunity analysis in the context of a *Bivens* action is identical to that applied in an action brought under 42 U.S.C. § 1983.   *Wilson v. Layne,* 526 U.S. 603, 609 (1999).

### 1.      Plaintiffs Fail to Allege Violations of Constitutional Rights.

The Fifth Amendment of the Constitution of the United States mandates that "[n]o person shall ... be deprived of life, liberty, or property without due process of law."   U.S. Const. amend. V.   The "touchstone of due process is protection of the individual against arbitrary action of the government."   *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).   The Fifth Amendment guarantees two types of due process—procedural and substantive.   *Collins v. City of Harker Heights,* 503 U.S. 115, 125 (1992).   Whereas procedural due process "provide[s] a guarantee of fair procedure in connection with any deprivation of life, liberty, or property" by the government, substantive due process "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'"   *Id.* (quoting *Daniels v. Williams,* 474 U.S. 327, 331 (1986)).

In general, the government's "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."   *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909 (10th Cir. 2012) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Serv.,* 489 U.S. 189, 197 (1989)).   Accordingly, government actors generally may only be held liable under *Bivens* "for their own acts, not for the violent acts of third parties."   *Ruiz v. McDonnell*, 299 F.3d 1173, 1182 (10th Cir. 2002), *cert. denied*, 538 U.S. 999 (2003).   The Tenth Circuit has "recognized two exceptions to this general rule:   (1) the 'special relationship' exception; and (2) the 'danger creation' exception."   *Id.*   First, "[u]nder the 'special relationship' exception, liability may attach to a [government] actor for the violence of a third party if the [government] restrained the plaintiff's personal liberty interest and that restraint hindered the plaintiff's freedom to act to protect himself from the third party."   *Id.*   Second, "[u]nder the 'danger creation' exception, a [government] actor may be held liable for the violent acts of a third party if

the [government] actor 'created the danger' that caused the harm."   *Id.*

Here, although Plaintiffs repeatedly allege that the Individual Defendants established a "special relationship" with *Quintana*, *see, e.g.,* Doc. 19 ¶ 778, the First Amended Complaint is devoid of allegations that any of the Individual Defendants restrained the personal liberty interest of any of *the Plaintiffs*.   Because the "special relationship" exception "applies only in the presence of a custodial relationship between the *victim* and the [government]," *Gray*, 672 F.3d at 923 (emphasis added), that exception is inapplicable here.   Accordingly, the only possible means by which the Individual Defendants might be held liable for Quintana's acts of private violence is under the state-created danger theory.

The state-created danger theory is "a *narrow exception*, which applies only when a state actor affirmatively acts to create, or increase[] a plaintiff's vulnerability to, danger from private violence."   *Gray*, 672 F.3d at 921 (emphasis in original) (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir. 2006)).   There are thus two "preconditions" necessary to invoking the state-created danger theory.   *Id.* at 920 n.8.   First, the "state-created danger doctrine *necessarily involves affirmative conduct* on the part of the [government] in placing the plaintiff in danger."   *Id.* at 916 (emphasis in original) (quoting *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991 (10th Cir. 1994)).   Unless the government has "'limited in some way the liberty of a citizen to act on its own behalf, . . . inaction by the [government] in the face of a known danger is not enough to trigger the obligation.'"   *Id.* (quoting *Graham*, 22 F.3d at 995).   Second, because the state-created danger theory is "a means by which government actors may be held constitutionally liable for acts of *private violence* under prescribed circumstances," there must be a showing of private violence.   *Id.* at 917 (emphasis in original).

In addition to establishing the preconditions of affirmative conduct and private violence, in order to succeed on a state-created danger claim, a plaintiff must meet *all* elements of the following six-factor test:

> (1) the charged [government] entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013).

At the outset, Plaintiffs must allege facts that, if proven, would establish both affirmative conduct on the part of the Individual Defendants and private violence.   It is beyond dispute that the First Amended Complaint adequately alleges violence by Quintana against JGE and Jason Estrada, and thus the private violence requirement is met.   Plaintiffs argue that the Individual Defendants engaged in affirmative conduct by first recruiting, establishing, and activating Quintana as a confidential informant, and then by recklessly failing to control and supervise Quintana.   Doc. 52 at 24, 47.   The Court agrees that allegations regarding the initial recruitment, establishment, and activation of Quintana as a confidential informant are sufficient to allege affirmative conduct.   On the other hand, allegations that the Individual Defendants failed to control and supervise Quintana during the time that he worked as a confidential informant are all allegations of "failures to act . . . [which] did not change the status quo." *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1107 (10th Cir. 2014).

This conclusion is not altered by the allegation that the Individual Defendants were aware that Quintana's "violent propensities" could result in the assault of JGE or the homicide of Jason Estrada, Doc. 52 at 24, because, in the absence of a custodial relationship, "Plaintiffs cannot state

a constitutional claim based upon the [Individual Defendants'] alleged knowledge of dangerous circumstances." *Graham*, 22 F.3d at 995. Accordingly, the Individual Defendants' "alleged nonfeasance in the face of specific information which would mandate action does not invoke the protections of the Due Process Clause." *Id.* The remaining analysis before the Court thus is whether the Individual Defendants' activation of Quintana as a confidential informant satisfies all six elements of the state-created danger test. As set forth herein, the Court determines that it does not.

Read together, factors two and three of the state-created danger test require that the government actor's affirmative conduct involve conduct that "imposes an immediate threat of harm, which by its nature has a limited range and duration" and is "directed at a discrete plaintiff rather than at the public at large." *Ruiz*, 299 F.3d at 1183. Thus, in *Graham*, where two mothers brought § 1983 actions against a school district after their children had been shot or stabbed by other students at school, the Tenth Circuit held that "any danger to the victims was too remote a consequence of defendants' action [of enrolling the aggressors in public school] to hold them responsible under the federal civil rights law." 672 F.3d at 995. Similarly, in *Ruiz*, where a mother brought a § 1983 action after the death of her child in a state-licensed home daycare, the Tenth Circuit found that the state's licensure of the daycare provider, who failed to meet the state requirements for licensure, did not constitute the requisite affirmative conduct, because it did not "impose an immediate threat of harm," but rather "presented a threat of an indefinite range and duration," and "affected the public at large; it was not aimed at [the child] or [his mother] directly. . . . [T]he mere licensure of [the daycare] was not an act directed at [the child] which, in and of itself, placed [the child] in danger." 299 F.3d at 1183.

Following *Graham* and *Ruiz*, in *Gray*, where family members brought a § 1983 action after the death of a patient in a state university hospital, the Tenth Circuit found that the hospital's policy of assuring patients of 24-hour monitoring but allowing its staff to leave such patients unattended was "too remote to establish the necessary causal link between the danger to the victim and the resulting harm, because the adoption of its policies and customs did "not foist upon anyone an immediate threat of harm having a limited range and duration or "pose a direct threat to any one particular individual," but rather affected "a broad populace."   672 F.3d at 926.   Citing the Sixth Circuit's opinion in *Jones v. Reynolds*, 438 F.3d 685, 697 (6th Cir. 2006), *cert. denied*, 549 U.S. 1166 (2007), holding that § 1983 will not support a claim under the state-created danger theory where the victim was not identifiable at the time of the alleged state action, the Court in *Gray* noted that at the time the defendants adopted the relevant policies and customs, the "decedent was not an identifiable victim."   672 F.3d at 926.   Because the policies and customs had been in effect before the decedent was a patient at the hospital, the Court explained, they were not aimed at him and thus did not pose a threat of immediate and proximate harm to him.   *Id.* at 927.

The Court acknowledged that the defendant's policies and customs "did not increase the danger to the public at large in any real sense, but rather to a defined group, namely patients in the [Epilepsy Monitoring Unit of the University of Colorado Hospital]."   *Id.*   The Court stated that this fact did "not undermine its analysis," noting that in *Ruiz* and another similar case, *Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008), it had held that the states' "wrongful licensures of the daycare facilities did not constitute affirmative conduct sufficient to warrant application of the state-created danger theory, despite that in reality those licensures only enhanced the danger of abuse to the unfortunate children enrolled in those daycare facilities."

13

*Id.* Thus, the Court explained, "[t]he 'public at large' or 'the public in general' was unaffected despite [its] lax use of these phrases in these cases." *Id.* Given its prior holdings, and its "requirement that a defendant's conduct put the victim at substantial risk of immediate and proximate harm," the Court concluded that the defendant's "adoption of policies and customs generally applicable to all EMU patients, even if done in reckless disregard of a *generalized* risk, did not constitute affirmative conduct sufficient to impose § 1983 liability on Defendants under the state-created danger theory." *Id.; see also Martinez v. State of Cal.*, 444 U.S. 277 (1980) (holding that where an individual was released from prison and, five months later, murdered the victim, the parole officers who were responsible for the murderer's release could not be held responsible under the federal civil rights law because the victim's death was too remote a consequence of the parole officers' action and the parole board was not aware that the victim, as distinguished from the public at large, faced any special danger); *Hernadez v. Riley*, 734 F.3d 1254, 1260 (10th Cir. 2013) (holding that defendant's adoption of policies failed to satisfy the affirmative conduct or causation requirements under the state-created danger theory because at the time he adopted the policies, the victims were not identifiable victims"); *Kennerly v. Montgomery Cty Bd. of Comm'rs*, 257 F. Supp. 2d 1037, 1044 (S.D. Ohio 2003) ("[A] plaintiff cannot merely . . . nam[e] a more particular subclass of the public as the group to which the government owed a duty, such as one's 'neighbors.' Neighbors are still the public.").

Here, the Individual Defendants activated Quintana as an informant in September or October of 2011. It was not until September 2012, a full year later, that Quintana moved into the Estrada residence and began to sexually abuse JGE. Further, it was not until April 2013, approximately 18 months after he was activated, that Quintana murdered Jason Estrada. There are no allegations in the First Amended Complaint that, at the time of his activation, the

Individual Defendants knew or should have known that Quintana posed a threat to JGE or Jason Estrada or, indeed, even knew or should have known of the existence of JGE or Jason Estrada. Under these circumstances, "any danger to the victims was too remote a consequence" of the Individual Defendants' activation of Quintana as an informant to establish the requisite causal link under the state-created danger theory. *Graham*, 22 F.3d at 995. Specifically, their activation of Quintana as an informant did not impose "an immediate threat of harm, which by its nature ha[d] a limited range and duration," and was not "aimed at" JGE or Jason Estrada, but rather affected the public at large. *Ruiz*, 299 F.3d at 118.

Plaintiffs argue that the causal link between the Individual Defendants' conduct and Quintana's violent behavior is sufficiently established because Quintana's sexual abuse of JGE began almost immediately upon Quintana moving into the Estrada residence, and because JGE and Jason Estrada were part of a limited and specifically definable group, namely "household members." Doc. 52 at 47. The relevant inquiry, however, is whether the government actor's affirmative conduct imposes an immediate threat of harm. Here, the relevant affirmative conduct was the Individual Defendants' activation of Quintana as an informant, which occurred in September or October of 2011. The date on which Quintana moved into the Estrada residence is irrelevant to this inquiry. Because the harm to JGE and Jason Estrada did not occur until 12 or 18 months after the Individual Defendants activated Quintana, their activation of Quintana as an informant did "not foist upon anyone an immediate threat of harm having a limited range and duration." *Gray*, 672 F.3d at 926. At most, Plaintiffs allege that the Individual Defendants knew of Quintana's history of violence toward *his own* family members, particularly his wife. Such knowledge, however, may at best demonstrate that activation of Quintana as an informant may have created an immediate threat of harm to Quintana's wife, but

15

not to the Estrada family.

Similarly, it is not sufficient that JGE and Jason Estrada belonged to a "particular subclass of the public," namely, household members.   *See Kennerly*, 257 F. Supp. 2d at 1044. At the time that the Individual Defendants activated Quintana as an informant, neither JGE nor Jason Estrada was a "household member" of Quintana's.   Indeed, there is no indication from the First Amended Complaint that either JGE or Jason Estrada was or should have been, for any reason, "an identifiable victim."   *See Gray*, 672 F.3d at 926.   Further, even assuming *arguendo* that, as Plaintiffs appear to contend, the activation of Quintana as an informant "only enhanced the danger of abuse to the unfortunate [individuals]" who became Quintana's household members, the Court is foreclosed by *Gray* from finding the Individual Defendants' conduct sufficient to impose § 1983 liability because, as discussed above, that conduct did not "put the victim[s] at substantial risk of immediate and proximate harm."   *Id.* at 927.

For much the same reasons, Plaintiffs fail to satisfy the fifth element of the state-created danger test, namely, that the Individual Defendants acted recklessly in conscious disregard of the risk to JGE and Jason Estrada.   "[I]n reckless conduct, the defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff."   *Uhlrig v. Harder*, 64 F.3d 567, 673 n.8 (10th Cir. 1005), *cert. denied*, 516 U.S. 1118 (1996).   The First Amended Complaint is devoid of allegations that, when they activated Quintana as an informant, the Individual Defendants recognized the risk that Quintana posed to JGE and Jason Estrada, and intended to expose JGE and Jason Estrada to those risks, without regard to the consequences to either victim.   Again, at most, Plaintiffs allege that the Individual Defendants knew of Quintana's violent propensities, which included a history of violence toward *his own* family members, particularly his wife.   Such knowledge,

16

however, falls short of demonstrating conscious disregard of the risk to unidentified individuals with whom Quintana chose to live more than a year after he was activated as an informant.   *See Phillips v. Grady Cty. Bd. of Cty. Commr's*, 92 F. App'x 692, 698 (10th Cir. 2004) (danger-creation claim failed because of lack of evidence that defendants recklessly disregarded a risk that a particular individual would have the victim killed).

Having found that Plaintiffs have failed to allege facts that, if proven, would satisfy all elements of the state-created danger test, it follows that Plaintiffs have failed to allege facts sufficient to show that the Individual Defendants plausibly violated the substantive due process rights of JGE and Jason Estrada.   Accordingly, Plaintiffs are unable to meet their burden under the first prong of the qualified immunity analysis.

### 2.    Plaintiffs Fail to Demonstrate that the Substantive Due Process Rights Alleged Were Clearly Established.

Indeed, even if Plaintiffs were able to establish a substantive due process violation, the Individual Defendants would nonetheless be entitled to qualified immunity, as Plaintiffs have failed to establish that the law was clearly established that the Individual Defendants' affirmative conduct denied either JGE or Jason Estrada substantive due process rights.   Plaintiffs' burden is to show that, at the time Quintana sexually abused JGE and killed Jason Estrada, the law was clearly established that the Individual Defendants' activation of Quintana as an informant denied JGE and/or Jason Estrada certain substantive due process rights.   *B.I.C.*, 761 F.3d at 1105–06.

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his [or her] actions violate that right."   *Lundstrom*, 616 F.3d at 1118–19 (citation omitted).   "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."   *Fisher v. City of Las Cruces*, 584 F.3d 888, 900 (10th Cir. 2009) (citation

omitted).   Accordingly, a "plaintiff must do more than identify in the abstract a clearly established right and allege that the defendant has violated it."   *Lundstrom*, 616 F.3d at 1119. Specifically, a "plaintiff must show legal authority making it apparent that in light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue."   *Id.*

This does not mean that the plaintiff must "present a case with an identical factual situation."   *Id.*   To the contrary, the Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).   The "salient question" thus is whether the state of the law at the time of the alleged misconduct gave the defendant "fair warning" that his or her alleged misconduct was unconstitutional.   *Id.*   To answer this question in the affirmative, ordinarily, there must be "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."   *Brown*, 662 F.3d at 1164 (citation omitted).   In response to a motion to dismiss, the plaintiff has the burden "of articulating such clearly-established law."   *Walker v. City of Orem*, 451 F.3d 1139, 1151 (10th Cir. 2006).

Further, "[t]he Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."   *Id.* (quoting *Plumhoff v. Rickard,*134 S. Ct. 2012, 2023 (2014)).   "Thus, a general statement of law—such as that a state cannot increase one's vulnerability to private violence—is not sufficient to show that the law was clearly established."   *Id.*

In support of their argument, Plaintiffs cite to only one Supreme Court case, *DeShaney*.   In *DeShaney*, however, the Supreme Court held that there was no due process violation in the case before it.   *See* 489 U.S. at 197 (finding defendant's entitlement to judgment where child and his mother brought suit for violation of the child's right to substantive due process).   As such, *DeShaney* "could hardly support, much less clearly establish, a violation by [the Individual Defendants]."   *B.I.C.*, 761 F.3d at 1106.   Similarly, the cases to which Plaintiffs cite, from both the Tenth Circuit and other circuits, discuss the state-created danger doctrine in general terms, reject the applicability of the doctrine to the facts of those cases, or address the wholly separate issue of governmental liability under the Federal Tort Claims Act.   While Plaintiffs try to distinguish the cases rejecting substantive due process claims based on the state-created danger theory in the context of the use of confidential informants, Plaintiffs' "burden is not merely to show that adverse case law might be distinguishable."   *Id.* at 1108.   Rather, under the second prong of the qualified immunity analysis, their "burden is to show that the law was *clearly* in [their] favor."   *Id.* (emphasis in original).   Plaintiffs have not satisfied that burden. Accordingly, for this additional reason, the Individual Defendants are entitled to qualified immunity on Plaintiffs' substantive due process claims, and those claims must be dismissed.

**C.     The Individual Defendants Are Entitled to Qualified Immunity for Plaintiffs' Familial Association Claims.**

In Counts XX, XXIII, XXVI, XXIX, XXXIII, and XXXVI, Plaintiffs allege that each of the Individual Defendants "recklessly and with deliberate indifference" activated Quintana as a confidential informant and failed to supervise him properly, thereby causing "severe emotional and physical harms (to include lasting damage to family integrity and companionship) to the Plaintiffs."   *See e.g.,* Doc. 19 ¶¶ 757, 758, 767.   Based on these allegations, Plaintiffs claim that each of the Individual Defendants violated JGE, Gabriela Gallegos, Jolene Estrada, and

Joyce Estrada's constitutionally protected interests in familial integrity and companionship. *See, e.g., id.* ¶ 760.

In *Trujillo v. Bd. of Cty. Comm'rs of Santa Fe Cty.*, 768 F.2d 1186 (10th Cir. 1985), the Tenth Circuit recognized the right to intimate or familial association as a constitutionally protected liberty interest.   *Bryson v. City of Edmond*, 905 F.2d 1386, 1393 (10th Cir. 1990).   In order to state a *Bivens* claim based on a deprivation of this right, however, "an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required."   *Id.* (quoting *Trujillo*, 768 F.2d at 1190); *see also B.I.C.*, 710 F.3d at 1175.   In other words, alleged conduct by government actors "will work an unconstitutional deprivation of the freedom of association only if the conduct was directed at that right."   *Trujillo*, 768 F.2d at 1190.   Accordingly, where a plaintiff fails to allege any specific intent to interfere with his or her familial relationship, his or her claim is subject to dismissal for failure to state a constitutional claim.   *Id.; B.I.C.*, 710 F.3d at 1175.

Under this standard, the facts that Plaintiffs have alleged in support of their familial association claims do not make out a violation of a constitutional right.   Read in the light most favorable to Plaintiffs, the First Amended Complaint alleges that the Individual Defendants acted with the intention of activating Quintana as a confidential informant, in reckless disregard of his propensity for violence and the consequent danger he posed to third parties.   Nowhere in the First Amended Complaint, however, "is there an allegation that any claimed acts or omissions, however intentional, occurred with the specific intent on the part of the [Individual Defendants] to deprive Plaintiff[s] of [their] rights of association" with Jason Estrada.   *Bryson*, 905 F.2d at 1394.

20

In response to the Individual Defendants' motion, Plaintiffs do not mention, much less refute, their failure to allege specific intent on the part of the Individual Defendants to deprive any of the Plaintiffs of their rights of association with Jason Estrada.   The only reference in Plaintiffs' response to their familial association claims is the statement that they had "clearly established" rights "not to suffer from the destruction of family companionship and association" and "to continued family relationship."   Doc. 52 at 25.   This statement is insufficient to state a constitutional claim.   *Bryson*, 905 F.2d at 1394 (holding that complaint failed to state *Bivens* claim where there were no allegations "that any claimed acts or omissions, however intentional, occurred with the specific intent on the part of the defendants to deprive the plaintiffs of their rights of association with the victims").

Absent allegations of intent on the part of the Individual Defendants to deprive Plaintiffs of their rights to familial association, the First Amended Complaint fails to allege facts sufficient to show that the Individual Defendants plausibly violated Plaintiffs' constitutional rights. Plaintiffs thus have failed to meet their burden under the first prong of the qualified immunity analysis.   Accordingly, the Individual Defendants are entitled to qualified immunity on Plaintiffs' familial association claims, and those claims must be dismissed.

## II.   United States' Rule 12(c) Motion for Judgment on the Pleadings

Plaintiffs allege that because the DEA used Quintana as a confidential informant, it should have prevented Quintana from inflicting violence on JGE and Jason Estrada or warned the Estrada family that Quintana was dangerous.   The First Amended Complaint bases the causes of action against the United States on its alleged negligent supervision of Quintana or negligent failure to warn of or prevent Quintana's violent acts against JGE and Jason Estrada. *See* Doc. 19 (Counts I–XVII).   The United States moves for judgment on the pleadings on two

grounds.    First, the United States argues that New Mexico does not recognize a cause of action against a private individual under the circumstances described in the First Amended Complaint. Second, the United States argues that the conduct described by Plaintiffs falls within the discretionary functions of law enforcement.    As set forth herein, the Court agrees that Plaintiffs have failed to allege facts sufficient to state a claim of negligence under New Mexico law. Accordingly, the Court need not reach the issue of whether the DEA's conduct falls within the discretionary function exception, and all claims against the United States must be dismissed.

### A.    Legal Standard

#### 1.    Motion for Judgment on the Pleadings

"Any party may move for judgment on the pleadings if no material facts are in dispute, and the dispute can be resolved on both the pleadings and any facts of which the Court can take judicial notice."    *Swepi, LP v. Mora Cty., N.M.*, 81 F. Supp. 3d 1075, 1124 (D.N.M. 2015). "Such motions are functionally equivalent to motions to dismiss and are reviewed under the same standards."    *Estate of Stevens ex rel. Collins v. Board of Com'rs of Cty. of San Juan*, 53 F. Supp. 3d 1368, 1372 (D.N.M. 2014).    *See also Mata v. Anderson*, 760 F. Supp. 2d 1068, 1083 (D.N.M. 2009) ("A motion pursuant to rule 12(c) is generally treated in the same manner as a motion to dismiss under rule 12(b)(6)."); *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000) ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6).").    The standard on a motion to dismiss for failure to state a claim is set forth above.

#### 2.    The Federal Tort Claims Act

"It is well-settled that no action lies against the United States unless Congress has authorized it."    *Miller v. United States*, 463 F.3d 1122, 1123 (10th Cir. 2006); *see also United*

*States v. Bormes*, 133 S. Ct. 12, 16 (2012) ("Sovereign immunity shields the United States from suit absent a consent to be sued that is unequivocally expressed.") (internal quotation marks omitted).   The Federal Tort Claims Act ("FTCA") effects a "broad waiver of sovereign immunity" for torts arising out of the conduct of employees of the United States.   *Millbrook v. United States*, 133 S. Ct. 1441, 1443 (2013); s*ee also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217–18 (2008).   "The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his [or her] claims."   *Garcia v. United States*, 709 F. Supp. 2d 1133, 1138 (D.N.M. 2010) (Browning, J.); *accord Bork v. Carroll*, 449 F. App'x 719, 721 (10th Cir. 2011) (unpublished).   As is relevant here, the FTCA waives only the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, *if a private person*, would be liable."   28 U.S.C. § 1346(b)(1) (emphasis added); *see also United States v. Olson*, 546 U.S. 43, 44 (2005) (interpreting the text of the FTCA "to mean what [it says], namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a 'private person' liable in tort").

Thus, § 1346 "contains two basic principles that govern FTCA claims."   *Rehoboth McKinley Christian Healthcare Servs., Inc. v. U.S. Dept. of Health and Human Servs.*, 853 F. Supp. 2d 1107, 1113 (D.N.M. 2012) (Vázquez, J.) (internal quotation marks omitted).   First, the FTCA does not itself create any substantive basis for liability; rather, it merely provides that the tort law of the state where the conduct occurred applies to the United States.   *See Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1117 (10th Cir. 2004) ("State substantive law applies to suits brought against the United States under the FTCA."); 28 U.S.C. § 1346(b)(1) (stating that liability is determined "in accordance with the law of the place where the act or omission

occurred.").   Second, the FTCA makes clear that the United States is only liable to the same extent as private individuals in comparable circumstances.   *See Coffey v. United States*, 870 F. Supp. 2d 1202, 1220 (D.N.M. 2012) ("The United States' liability is coextensive with that of private individuals under the respective States' law, even if comparable government actors would have additional defenses or additional obligations under that State's law.").   Here, every alleged act or omission at issue occurred in New Mexico; consequently, the Court will apply the substantive tort law of New Mexico in this case.   *See, e.g.*, *E.P. ex rel. Portenier v. United States*, 835 F. Supp. 2d 1109, 1115 (D. Kan. 2011) ("Here, all alleged acts and omissions occurred in Kansas, and so Kansas state law applies."), *aff'd*, 520 F. App'x 707 (10th Cir. 2013).

Liability under the FTCA is subject to certain exceptions, including the "discretionary function" exception, raised by Plaintiffs, which "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."   *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).   Under the discretionary function exception, the United States is not liable for "any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused."   28 U.S.C. § 2680(a).   In other words, "[t]he exception applies even if the governmental employees were negligent."   *Aragon v. United States*, 146 F.3d 819, 822 (10th Cir. 1998).   Further, the exception "poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his [or her] overall burden to establish subject matter jurisdiction."   *Id*. at 823 (citation omitted).

### B.     The Instant Case

Each of Plaintiffs' tort claims against the United States sounds in negligence.   *See* Doc. 19 ¶¶ 427–718 (enumerating Counts I–XVII against the United States).   Under New Mexico law, a "negligence claim requires that the plaintiff establish four elements:   (1) defendant's duty to the plaintiff, (2) breach of that duty, typically based on a reasonable standard of care, (3) injury to the plaintiff, and (4) the breach of duty as cause of the injury."   *Zamora v. St. Vincent Hosp.*, 335 P.3d 1243, 1249 (N.M. 2014); *see also Tapia v. City of Albuquerque*, 10 F. Supp. 3d 1207, 1302 (D.N.M. 2014).   Consistent with the rule governing the vast majority of jurisdictions, New Mexico courts hold that "[w]hether the defendant owes a duty to the plaintiff, is a legal question for the courts to decide."   *Lujan v. New Mexico Dep't of Transp.*, 341 P.3d 1, 4 (N.M. Ct. App. 2014), *cert. denied*, 339 P.3d 841 (N.M. 2014).   *See also Wild Horse Observers Ass'n, Inc. v. New Mexico Livestock Bd.*, 363 P.3d 1222, 1228 (N.M. Ct. App. 2015) ("The existence of a legal duty is a question of law.").

The New Mexico Supreme Court has clearly and consistently held that the existence of a duty depends on whether the plaintiff and the injury to the plaintiff were reasonably foreseeable. *See, e.g., Ramirez v. Armstrong*, 673 P.2d 822, 825 (N.M. 1983), *overruled on other grounds by Folz v. State*, 797 P.2d 246, 249 (1990) ("If it is found that a plaintiff, and injury to that plaintiff, were foreseeable, then a duty is owed to that plaintiff by the defendant.") (citing *Palsgraf v. Long Island Railroad Co.*, 248 N.E. 99 (N.Y. 1928)).   Foreseeability is related also to proximate cause, which "is generally a question of fact for the jury."   *Herrera v. Quality Pontiac*, 73 P.3d 181, 186 (N.M. 2003) (citation omitted).   However, duty is a question of law for courts to decide because "duty establishes the legally recognized obligation of the defendant to the plaintiff."   *Id.*

(quotation marks and quoted authority omitted).[2]   In order for this Court to find that the United States had a duty to protect Plaintiffs from harm by Quintana, such an obligation must be recognized under New Mexico "legal precedent, statutes, and other principles of law."   *Id.*

Liberally construed, Plaintiffs proffer three arguments for why the United States owed them a duty, each of which is addressed in turn.   In sum, Plaintiffs must identify a private person analogy recognized under New Mexico law that confers on the United States a duty to protect Plaintiffs from harm by Quintana.   Because Plaintiffs fail to identify a private person analogy that confers a duty in comparable circumstances, Plaintiffs' claims under the FTCA must be dismissed.

### 1.    The "State Created Danger" Doctrine Does Not Apply to Private Persons.

First, in Counts I and II of the First Amended Complaint, Plaintiffs seek to invoke the "state created danger" doctrine and, by extension, to impose a duty of care and duty to warn on the United States for the conduct of Edward Quintana.   *See* Doc. 19 ¶¶ 427–474.   *See also* Doc. 51 at 21–29 (arguing that the state created danger doctrine applies in the instant case). The state-created danger doctrine, described in detail above, provides a means of holding *government actors* liable for the violent acts of a third party where the charged *government entity* and the charged individual *government actors* created the danger or increased plaintiff's vulnerability to the danger in some way.   *See Ruiz*, 299 F.3d at 1182; *B.I.C.*, 710 F.3d at 1173. This theory of recovery, by definition, applies only to *government actors*, not to private parties.

---

[2]  The court in *Herrera* adopted the following distinction between duty and proximate cause: "The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others. The proximate causation element, on the other hand, is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred. In other words, the former is a minimal threshold *legal* requirement for opening the courthouse doors, whereas the latter is part of the much more specific *factual* requirement that must be proved to win the case once the courthouse doors are open."   *Herrera*, 73 P.3d at 186 (citing *McCain v. Fla. Power Corp.*, 593 So.2d 500, 502 (Fla. 1992)).

As explained above, the FTCA renders the United States liable *only* to the extent of a private party, such that inherently governmental duties are inapposite.   *See Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012) (the FTCA "does not waive sovereign immunity for claims against the government based on governmental action of the type that private persons could not engage in and hence could not be liable for under local law") (internal quotation marks omitted). *See also Olson*, 546 U.S. at 46 (unanimously reaffirming the "private person standard" and rejecting "a waiver of sovereign immunity solely upon" the basis that conduct is a uniquely governmental function).

Because the state-created danger doctrine applies only to governmental duties, rather than to private duties, this doctrine cannot be invoked in support of FTCA claims.   Count I and Count II thus seek to impose liability on the United States in a manner not cognizable under the FTCA and must be dismissed.

> **2.     No Special Relationship Existed Giving Rise to a Duty to Protect Plaintiffs.**

In Counts III through XVII, Plaintiffs allege, broadly stated, that the United States is liable for the negligent supervision of Edward Quintana.   In their Response to the United States' Motion, Plaintiffs make clear that they believe the duty underlying these claims rests on a "special relationship" between the United States and Quintana.   *See* Doc. 68 at 48 ("Contrary to defendant's contention, defendant had established a special relationship with Edward Quintana.").

In general, "[t]here is no duty to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." Restatement (Second) of Torts § 315 (1965).   New Mexico case law adopts the "special

relationship" exception to this general rule.   *See Ciup v. Chevron U.S.A., Inc.*, 928 P.2d 263, 265 (N.M. 1996) ("As a general rule, a person does not have a duty to protect another from harm caused by the criminal acts of third persons unless the person has a special relationship with the other giving rise to a duty."); s*ee also Romero v. Giant Stop-N-Go of New Mexico, Inc.*, 212 P.3d 408, 410 (N.M. Ct. App. 2009) ("One exception to the general rule is that a duty may arise out of a special relationship."), *cert. denied*, 214 P.3d 793 (N.M. 2009); *Thompson v. Potter*, 268 P.3d 57, 65 (N.M. Ct. App. 2011) ("Under New Mexico jurisprudence, special relationships arise out of particular connections between the parties, give rise to a special responsibility, and take the case out of the general rule [that there is no general duty to aid or protect others]." ) (internal quotation marks omitted).   Where a special relationship exists, "the criminal acts of a third person will not relieve a negligent defendant of liability if the defendant should have recognized that his or her actions were likely to lead to that criminal activity."   *Herrera*, 73 P.3d at 191 (internal quotation marks omitted).   Special relationships giving rise to a duty include "those [individuals] who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection."   *Grover v. Stechel*, 45 P.3d 80, 84 (N.M. 2002) (citing Restatement (Second) of Torts § 314(a)).   "In order to create a duty based on a special relationship, the relationship must include the right or ability to control another's conduct." *Id*. (citations omitted).   Importantly, consistent with New Mexico's general rule that the plaintiff and harm must be foreseeable, *Ramirez*, 673 P.2d at 825, the duty arising pursuant to a special relationship only pertains to foreseeable danger to foreseeable plaintiffs.[3]

---

[3] Restatement (Second) of Torts § 314(a), cmt. F ("The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained. He is not required to give any aid to one who is in the hands of apparently competent persons who have taken charge of him, or whose friends are present and

In addition, Section 319 of the Restatement provides that "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."   In particular, a defendant is liable when the third person has a "peculiar tendency so to act of which the [defendant] from personal experience or otherwise knows or should know," including when patients escape from medical care and commit foreseeable harm.[4] However, medical professionals are not liable when the type of misconduct after escape was unforeseeable and not within the defendant's duty of protection.   *See, e.g.*, *Hesler v. Osawatomie State Hosp.*, 971 P.2d 1169 (Kan. 1999) (holding that doctor had no duty to plaintiffs under § 319 because the patient never demonstrated any likelihood of causing bodily harm to others); *Kirk v. Michael Reese Hosp. and Medical Ctr.*, 513 N.E.2d 387 (Ill. 1987) (holding that neither doctors nor hospital owed a duty to the plaintiff to control the patient's conduct, in part because there had been no allegations that the hospital or doctors were aware of any dangerous propensities of the patient).   The Court therefore explores whether New Mexico's adoption of Section 319 towards medical professionals may serve as a private person analog for the instant case.

New Mexico courts have recognized two relevant duties that medical professionals may have to protect against harmful conduct by third parties.   First, "a doctor or institution can potentially be liable for injury caused by patients with known 'dangerous propensities' if the doctor exerts control over the patient."   *Brown v. Kellogg*, 340 P.3d 1274, 1276 (Ct. App. N.M. 2014) (citing *Wilschinsky v. Medina*, 775 P.2d 713 (N.M. 1989)*; see also Kelly v. Bd. of Trustees of Hillcrest Gen. Hosp., Inc.,* 529 P.2d 1233 (N.M. Ct. App. 1974); *Stake v. Woman's Div. of*

---

apparently in a position to give him all necessary assistance.").

[4]  Restatement (Second) of Torts § 319, cmt. A.   The Restatement also provides the following illustration of Section 319: "A operates a private sanitarium for the insane. Through the negligence of the guards employed by A, B, a homicidal maniac, is permitted to escape. B attacks and causes harm to C. A is subject to liability to C."

*Christian Serv.,* 387 P.2d 871 (N.M. 1963) (recognizing the potential duty to warn of patient's "dangerous propensities" when the defendant has actual knowledge of such propensities)). Second, "a doctor who is aware of specific threats to the life of an individual can potentially be liable for failing to disclose those threats to the authorities or to the person threatened." *Id.* (citing *Wilschinsky,* 775 P.2d at 715–16 (discussing *Tarasoff v. Regents of Univ. of Cal.,* 551 P.2d 334 (Cal. 1976))).

It is instructive that other federal courts have considered state case law applying Sections 315–319 of the Restatement to doctors as a private person analog to the federal government's use of confidential informants. For example, in *Marin v. United States,* 814 F. Supp. 1468 (E.D. Wash. 1992), the district court considered Washington state law interpreting Section 315 of the Restatement and held that the United States had a duty to warn the plaintiff after her abuser, who was acting as a government informant, absconded from his duties. The plaintiff was killed by INS informant Quintil Lopez. The federal agents who dealt with Lopez were aware of his prior assaults on the plaintiff, that he had possessed firearms, and that he had specifically threatened to kill the plaintiff. *Id.* at 1470. Aware of these dangers, the government conditioned Lopez's pretrial diversion on the agreement that Lopez would not return to the area where the plaintiff lived unless given permission. *Id.* at 1472. In ruling that the United States had a duty to warn the plaintiff after Lopez absconded from this agreement, the court explained that "Ms. Marin was a foreseeable victim" and that "there was a special relationship between the agents and Lopez." *Id.* at 1485 (citing Section 315). The court also cited *Jablonski ex rel. Pahls v. United States,* 712 F.2d 391 (9th Cir. 1983), in which the Ninth Circuit held that "under California law, Veterans Administration psychiatrists owed a duty to a patient's girlfriend to warn her as a foreseeable victim of the patient's violence where, even though the patient had made no specific threats

concerning any specific individuals, his previous history indicated that he would be likely to direct his violence against his girlfriend." *Marin*, 814 F. Supp. at 1486. The court in *Marin* ruled that the United States had a "duty to warn a known potential victim of a known danger." *Id*.

In contrast, the district court in *Vaughn v. United States* considered Kentucky state law and held that the United States did not owe a duty to plaintiffs who had been killed by an informant while attending a social gathering. 933 F. Supp. 660 (E.D. Ky. 1996). The government informant, Robert Foley, had prior convictions including murder and aggravated assault. While hosting a party at his home that was entirely unrelated to his duties as an informant, Foley shot and killed the plaintiffs after a fight broke out. *Id*. at 661–62. The court noted Kentucky case law similar to *Marin*, providing that a special relationship gives rise to a duty to protect foreseeable people from foreseeable harm. *Id*. at 662–63 (quoted authority omitted). However, the court ruled that "[a]lthough there may have been a special relationship between the FBI and the informant here, the injury to the decedents in the instant case was not foreseeable in that the informant had not specifically threatened them. Indeed, their unfortunate shootings were a spur of the moment conflict among friends. The victims were the social guests of the informant at the time. . . . Because of the clear lack of duty and causation, a private party would not be liable to the plaintiffs. And, under the FTCA, neither is the United States." *Id*. at 663–64.

Here, similar to *Vaughn*, the Court finds that there is no special relationship between the DEA and Quintana giving rise to a duty to protect Plaintiffs, for two reasons. First, unlike *Marin*, Plaintiffs' existence and harm were not reasonably foreseeable to the DEA. The DEA had no idea that Quintana had any contact with Plaintiffs, let alone that there was any threat of the harms Plaintiffs experienced. The DEA's knowledge of Quintana's violent capabilities primarily concerned domestic battery against his wife. Doc. 19 at 400. The Court does not

31

seek to determine whether the DEA had a duty to protect or warn Quintana's wife, but notes that Quintana's record of domestic violence indicates a specific threat of harm towards a specific person that may have obligated the DEA to protect Quintana's wife from harm, as in *Marin*. However, unlike *Marin*, where the government tried to protect the plaintiff by prohibiting Lopez from returning to the area where she lived, the DEA could not have reasonably foreseen the terrible tragedy that befell Plaintiffs, and so could not have imposed any conditions on Quintana's activities that would have limited his contact with the Estrada family.  Because at best the DEA only knew about potential threats to Quintana's own family, the Court finds that any potential special relationship between the United States and Quintana may have only given rise to a duty to protect or warn Quintana's wife.   However, such special relationship would not give rise to a duty to protect or warn Plaintiffs, whose involvement and harm, although extreme, could not have been foreseen.

Second, the DEA did not exert control over Quintana because it did not direct Quintana to move in with the Estradas, let alone harm them.   The facts of *Estate of Davis ex rel. Davis v. United States*, 340 F. Supp. 2d 79 (D. Mass. 2004), cited by Plaintiffs, illustrate the absence of a special relationship here.   *Davis* arose out of the FBI's infamous relationship with Stephen "the Rifleman" Flemmi and James "Whitey" Bulger, two members of the Winter Hill Gang.   *Id.* at 81.   Specifically, in exchange for working as informants for the FBI, agents allegedly promised to "protect the gangsters from prosecution for their [ongoing] criminal activities."   *Id.* at 82. Consequently, "the FBI not only failed to take action when it discovered that Flemmi and Bulger were committing crimes, including murder, but the FBI also allegedly helped Flemmi and Bulger evade investigation and prosecution by other law enforcement agencies."   *Id.*   On these facts, the district court found that a special relationship existed under Massachusetts tort law.   *See id.*

at 93.

The facts in the instant case are much more attenuated.   In *Davis*, federal agents "allowed—and in some instances even encouraged—Flemmi and Bulger to commit murder and other serious crimes" and did "whatever was necessary to protect Flemmi and Bulger."   *Id.* at 85–6.   Here, by contrast, the DEA did not ignore, conceal, or encourage any ongoing criminal activity.   Stated otherwise, the FBI agents in *Davis* knowingly insulated two murderers from prosecution over the course of decades, actively participated in the men's misconduct, and failed to warn even victims who "had close and prolonged associations with Flemmi."   *Davis v. United States*, 670 F.3d 48, 55 (1st Cir. 2012).   Here, by contrast, the DEA used Quintana as an informant in operations having nothing to do with the Estrada family.   The possibility of harm to the Estrada family was not foreseeable to the DEA, as it was not aware of Quintana's connection to the Estrada family until after Jason Estrada's death.

The Court acknowledges that Quintana's record of domestic violence, although not uncommon, should have indicated to the DEA that Quintana had serious violent tendencies. However, because the DEA had no indication that Quintana was prone to commit sexual molestation or murder, let alone against the Estrada family in particular, the Court is unable to find that the harms Plaintiffs have experienced, although outrageous, were reasonably foreseeable.   If anything, the government may have owed a duty to Quintana's wife, who arguably was in foreseeable danger, but cannot owe a duty to protect unforeseeable plaintiffs against unforeseeable harms.   Accordingly, the Court does not find that there was a special relationship between the United States and Quintana giving rise to a duty to protect Plaintiffs.

### 3.        The Analogy to Private Investigators is Unavailing.

Plaintiffs argue that the United States had a duty to protect Plaintiffs from harm by

33

Quintana because "the law enforcement activities, duties and functions of federal law enforcement agents are closely analogous to the activities, duties and functions of <u>Private Law Enforcement Practitioners</u> in New Mexico."   Doc. 68 at 42 (emphasis in original).   However, because this analogy fails to address the factual scenario of the present case, Plaintiffs fail to show that New Mexico law finds private individuals liable in comparable circumstances.   While the Private Investigations Act and the New Mexico Administrative Code establish various requirements for private law enforcement officers in New Mexico, nothing in either the statute or the regulations indicates that the United States owed a duty to Plaintiffs.   *See generally* N.M.S.A §§ 61-27B-1, *et seq.*, N.M.C.A. §§ 16.48.1, *et seq.*   In particular, nothing in the provisions cited by Plaintiffs purports to alter the ordinary rule that there is no duty to protect another from harm.   While the Private Investigations Act provides that private investigation and private patrol companies are "liable for the conduct of the company's employees," the statute does not articulate any duty owed by private investigators to third parties.   N.M.S.A. § 61-27B-23.

Plaintiffs cite *Karbel v. Francis,* 709 P.2d 190 (N.M. Ct. App. 1985), which the Court finds distinguishable from the present case because the conduct of the defendant was directly connected to the harm to the plaintiff.   In *Karbel*, security guards employed by the Southwest Indian Polytechnic Institute observed an individual "driving slowly on campus" after which he "stopped the car and got out, staggering and with a beer in his hand."   *Id.* at 191.   The guards confronted the obviously intoxicated person and "demanded he leave or they would call the state police."   *Id.*   Upon complying with the guards' command, the individual got back into his car, "crossed into the wrong lane and ran a stop sign," ultimately causing an accident.   *Id.* at 192.

34

In reversing and remanding the trial court's entry of summary judgment in favor of the security guard company, the court applied ordinary negligence principles, which provide that where "the original negligence of the defendant is followed by the independent act of a third party which directly results in injury to the plaintiff, the defendant's earlier negligence may be found to be the proximate cause of the injury, if according to human experience" the harm was foreseeable.   *Id*.   The court explained that the "duty of one who takes charge of a third person whom he knows or should know to be likely to cause harm to others, if not controlled, is the duty to exercise reasonable care to prevent the person from doing harm."   *Id.* at 193 (citing Restatement (Second) of Torts § 319).   Thus, in the court's view, the "guards, in the exercise of their duties, undertook to remove Francis from the campus," such that defendants owed a duty to foreseeable victims.   *Id.*

For the same reasons discussed above, the Court is not persuaded that the rule articulated in *Karbel* confers a duty on the United States in the present case.   In *Karbel*, the guards ordered an obviously intoxicated man to operate a motor vehicle, which foreseeably resulted in a traffic accident almost immediately thereafter.   Here, in contrast, DEA agents did not direct Quintana to take up residence with the Estrada family, let alone harm them.   In other words, the act of activating Quintana as a confidential informant did not create a foreseeable increased risk that Quintana would commit the harms Plaintiffs have endured.   Whereas the security guards in *Karbel* were aware of an imminent, obvious harm that an intoxicated individual could cause an accident, the DEA in the instant case was not aware of an imminent and obvious danger that Quintana would commit such extreme violence against the Estrada family.

Because the Court finds that the United States did not have a duty under New Mexico law to protect Plaintiffs from harm by informant Quintana, Plaintiffs fail to state a claim under the FTCA.   Accordingly, this Court lacks subject matter jurisdiction to hear Plaintiff's claims against the United States, and all claims against the United States must be dismissed.

### 4.      Plaintiffs' Argument That the Discretionary Functions Exception Does Not Apply Is Moot.

Plaintiffs argue that the discretionary functions exception does not apply because the government did not follow its own policies.   Because the Court finds that Plaintiffs fail to state a claim under the FTCA, the Court does not reach the issue of whether the government's negligence is nevertheless exempt from liability under the discretionary functions exception. However, the Court notes that "[i]t is virtually axiomatic that the FTCA does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs."   *United States v. Agronics Inc.*, 164 F.3d 1343, 1345 (10th Cir. 1999).

### C.      Final Observations

For the foregoing reasons, this Court lacks subject matter jurisdiction over Plaintiffs' FTCA claims.   Plaintiffs have not identified a theory of liability for a private person that would apply to the circumstances in the instant case, and the Court is unable to identify such a duty under New Mexico law because the harms to Plaintiffs were not reasonably foreseeable. Because the Court finds that the United States has not waived sovereign immunity, the United States is entitled to judgment on the pleadings as to all of the claims against it, and Counts I–XVII must be dismissed.

It is worth stating, however, that although the Court is limited by the only possible legal outcome in this case, the grave harms to Plaintiffs in this case raise concerns as to the way

federal law enforcement selects and handles its confidential informants.   In light of the above constraints on the Court's ability to find a private person analogy under state law, federal legislative action is needed to impose accountability on federal law enforcement with respect to the handling of confidential informants, many of whom are extremely dangerous.   Before he was activated as a confidential informant, Edward Quintana's criminal record was violent. Although Quintana had never been arrested for a sexual crime or convicted of murder, the gravity of his record should have prompted the DEA to employ greater caution before intervening in ongoing state proceedings.   No one crossing Quintana's path had any way of knowing that, but for the federal government's intervention, Quintana would be facing state criminal charges.   This intervention also prevents people like Quintana from accessing rehabilitative programs and services through channels that become available during the criminal justice process.   In sum, confidential informants are considered useful for law enforcement purposes, but their well being and the well being of those around them lies outside the scope of the government's liability under the FTCA unless the harm was very directly foreseeable.   The Court emphasizes this problem today as a call for action to hold federal law enforcement agencies legislatively accountable for the unimaginable harms to victims such as the Estrada family, who will suffer the effects of Quintana's violent acts for the rest of their lives.

## CONCLUSION

For the foregoing reasons, the Individual Defendants are entitled to qualified immunity as to all of the claims against them, and those claims thus must be dismissed.   Further, the United States is entitled to judgment on the pleadings as to all of the claims against it, and those claims thus must be dismissed.

**IT IS THEREFORE ORDERED** as follows:   the Individual Defendants' Motion to Dismiss Based on Qualified Immunity and Memorandum in Support [Doc. 43] is **GRANTED**; the United States' Rule 12(c) Motion for Judgment on the Pleadings Based on Lack of Subject Matter Jurisdiction and Memorandum in Support [Doc. 59] is **GRANTED**; and the United States' Motion to Dismiss for Failure to State a Claim and Memorandum in Support [Doc. 44] is **DENIED AS MOOT**.


DATED this 9th day of August, 2016.

_____
MARTHA VAZQUEZ
United States District Judge

Erlinda O. Johnson                                        Karen Grohman
**Law Office of Erlinda Ocampo Johnson**        Ruth Fuess Keegan
*Attorney for Plaintiffs*                              **Assistant U. S. Attorneys**
                                                                 *Attorneys for Defendants*